# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| IRON WORKERS MID-SOUTH PENSION FUND, Derivatively on Behalf of U.S. BANCORP, | ) ) ) Case No. |
| Plaintiff, | ) |
| v. | ) VERIFIED SHAREHOLDER |
| RICHARD K. DAVIS, ANDREW CECERE, PATRICK T. STOKES, O'DELL M. OWENS, JERRY W. LEVIN, VICTORIA BUYNISKI GLUCKMAN, DAVID B. O'MALEY, ARTHUR D. COLLINS, JR., JOEL W. JOHNSON, CRAIG D. SCHNUCK, OLIVIA F. KIRTLEY, DOUGLAS M. BAKER, JR., Y. MARC BELTON, and RICHARD D. REITEN, | ) DERIVATIVE COMPLAINT FOR ) BREACH OF FIDUCIARY DUTY, ) WASTE OF CORPORATE ASSETS, ) AND UNJUST ENRICHMENT ) ) ) ) ) ) ) ) ) |
| Defendants, | ) |
| – and – | ) ) |
| U.S. BANCORP, a Delaware corporation, | ) ) |
| Nominal Defendant. | ) ) |
| | ) DEMAND FOR JURY TRIAL |

## SUMMARY OF IMPROPER PRACTICES

1.      This is a shareholder derivative action brought by plaintiff on behalf of nominal defendant U.S. Bancorp ("U.S. Bank" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law in connection with the Company's failure to fulfill its contractual and statutory duties as trustee of certain trusts that invested in mortgage-backed securities ("MBS").   These wrongs resulted in damage to U.S. Bank's reputation, goodwill, and standing in the business community.   Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      This action concerns defendants' responsibility for U.S. Bank's failure as a Trustee for various investment funds which purchased dozens of residential MBS (the "Covered Trusts").   In some instances, U.S. Bank was the original trustee, while in others it was the trustee as successor-in-interest.   In either event, as trustee for the Covered Trusts, U.S. Bank owed the certificate holders certain contractual duties, detailed in governing agreements as well as duties imposed by the Federal Trust Indenture Act of 1939, as amended, 15 U.S.C. §77aaa, *et seq* (the "TIA").

3.      Like all MBS, the MBS in the Covered Trusts only have value if they are backed by actual mortgage loans in which the Covered Trusts has validly taken title.   In order to ensure this, U.S. Bank's statutory and contractual obligations required it to take physical possession of the key documents in the mortgage loan files such as the promissory note establishing the mortgagor's personal liability ("Mortgage Note"), the mortgage evidencing the lender's interest in the underlying collateral ("Mortgage" or

"Mortgage Loan"), and the endorsements and assignments of the Mortgage Note and Mortgage Loan.  The Mortgage Note and Mortgage were critical for the trust investors for two reasons.  First, only the person who currently holds both the Mortgage Note and Mortgage has standing to enforce the Mortgage in a foreclosure action.  Thus, if both documents are not properly transferred to the Covered Trusts, the Covered Trusts cannot foreclose on a borrower that falls into default.  Second, if the transfer of a Mortgage is not recorded with the proper county authority, the holder of the Mortgage may lose its place as the first lien on the underlying property.  Therefore, any junior mortgagees or other creditors who have properly recorded their liens will have the right to payment from the sale of the underlying property before the Covered Trusts can recover from a foreclosure sale.

4.     The Company was also required to review the Mortgage Loan files to ensure that there were no Mortgage Loans with defective files, endorsements, or assignments.  Specifically, the governing agreements required U.S. Bank to complete an "Interim Certification" within ninety days of the securitization's closing, and a "Final Certification" within 180 days of the closing, certifying that U.S. Bank had reviewed all of the loan files for each of the Mortgage Loans in the Covered Trusts and had taken physical possession of the Mortgage Loan files.  If any problems were discovered, U.S. Bank was required to promptly notify various intermediary parties of any Mortgage Loans that had missing, defective, or incomplete documents in their loan files, and within ninety days after notifying the parties of such problems, to enforce the intermediaries'

obligation to cure the defects, substitute the defective Mortgage Loans with non-defective loans, or repurchase the defective loans.  U.S. Bank, however, failed on all fronts.

5.     In spite of its obligations, as detailed herein, U.S. Bank regularly disregarded its contractual and statutory duties to review the Mortgage Loan files to ensure that there were no missing, defective, or incomplete documents, and that defective loans were removed from the Mortgage pools supporting the MBS.  Further, U.S. Bank did not properly notify the intermediaries of any Mortgage Loans that had missing, defective, or incomplete documents in their loan files, and did not attempt to enforce the intermediaries' obligation to cure the defects, substitute the defective Mortgage Loans with non-defective loans, or repurchase the defective loans.

6.     U.S. Bank's failures to fulfill its contractual and statutory duties allowed Mortgage Loans to convey to the Covered Trusts which contained contain false representations and warranties in their files and various ratings agencies to incorrectly assess the quality of the MBS.  As a result of U.S. Bank's misconduct, the Mortgage Loans in the Covered Trusts have suffered hundreds of millions of dollars in losses, experienced high levels of payment delinquencies, delays in foreclosure actions, and substantial credit losses which would not have occurred if the Company properly performed its contractual and statutory responsibilities.

7.     As a direct result of defendants' unlawful course of conduct, the Company is now the subject of two class action lawsuits filed in the United States District Court for the Southern District of New York on behalf of investors who purchased MBS with U.S. Bank acting as trustee.  Nevertheless, despite being aware of the above, as explained

herein, the Board of Directors ("the "Board") of U.S. Bank has refused to act to hold those at the Company responsible for the harm described above accountable, in breach of its fiduciary duty.   Therefore, plaintiff now acts on behalf of the Company to correct these harms.

### THE BOARD IMPROPERLY REFUSED TO ACT IN
### RESPONSE TO PLAINTIFF'S DEMAND

8.      On February 29, 2012, plaintiff sent a letter to the Board[1] demanding that it investigate and take action against those that were responsible for U.S. Bank's failure to act appropriately as a trustee, and thereby harm the Company (the "Demand"). Amazingly, in a letter dated April 9, 2012, the Board refused to even investigate the matters raised in plaintiff's Demand.

9.      On May 2, 2012, plaintiff sent another letter to the Board requesting it reconsider its position.   This letter noted that Delaware law is explicit that upon receiving notice of potential wrongdoing, as was detailed in plaintiff's Demand, the "Board of Directors must investigate and evaluate the charges in order to discharge its duty to shareholders and manage corporate affairs responsibly."   Plaintiff again requested that the Board conduct an investigation into plaintiff's Demand, as required by its fiduciary duties.

10.     After more than a month of silence from the Board, on June 12, 2012, plaintiff requested a response to the Demand.   In a short, one-paragraph letter dated June

---

[1] At the time, the Board consisted of fifteen members.  In April 2012, one Board member retired and has not been replaced.

15, 2012, the Board again rejected plaintiff's Demand. U.S. Bank's counsel noted, however, that if plaintiff provided verification of ownership of U.S. Bank shares, the Board would take appropriate action within ninety days which may include the creation of a special litigation committee.

11.     On June 20, 2012, plaintiff sent a letter responding to the Board's rejection. The letter again highlighted controlling Delaware authority that unambiguously detailed the Board's duty to investigate and rectify corporate misconduct brought to its attention in the form of a litigation demand. Nonetheless, in a good faith effort to reduce further delay, per U.S. Bank's counsel's June 15, 2012 request, plaintiff attached a copy of a recent brokerage statement showing its ownership of U.S. Bancorp stock.

12.     On July 13, 2012, U.S. Bank's counsel responded to plaintiff's letter stating that the Board would not commence an investigation without verification that plaintiff held U.S. Bank shares during the entire relevant period, in direct contradiction to his statement in his June 15, 2012 letter stated that the Board would consider plaintiff's Demand if it provided proof of stock ownership.

13.     On August 6, 2012, plaintiff's counsel wrote to U.S. Bank's counsel and asked the Board to reconsider its decision and requested that the Board investigate and then initiate litigation against those that harmed the Company, as required under Delaware law. The Board never responded to this letter.

14.     Due to the Board's refusal to act, plaintiff now brings this action to correct the harm the Individual Defendants caused the Company.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) U.S. Bank maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to U.S. Bank occurred in this District; and (iv) defendants have received substantial compensation in this District

by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

18.     Plaintiff Iron Workers Mid-South Pension Fund was a shareholder of U.S. Bank at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current U.S. Bank shareholder.  Iron Workers Mid-South Pension Fund is a citizen of Texas, Louisiana, Oklahoma, and Mississippi.

### Nominal Defendant

19.     Nominal defendant U.S. Bank is a multi-state financial services holding company incorporated in Delaware in 1929 and operates as a financial holding company and a bank holding company under the Bank Holding Company Act of 1956.  U.S. Bank is a citizen of both Minnesota and Delaware.  U.S. Bank provides a full range of financial services, including lending and depository services, cash management, foreign exchange, and trust and investment management services.  It also engages in credit card services, merchant and ATM processing, mortgage banking, insurance, brokerage, and leasing. U.S. Bank's banking subsidiaries are engaged in the general banking business, predominantly in domestic markets.  U.S. Bank's bank and trust subsidiaries provide a full range of asset management and fiduciary services for individuals, estates, foundations, business corporations, and charitable organizations.  U.S. Bank National Association is U.S. Bank's principal banking subsidiary.  U.S. Bank is named in this

Complaint as a nominal defendant solely in a derivative capacity, and this shareholder derivative action is on its behalf.

**Defendants**

20.     Defendant Richard K. Davis ("Davis") is U.S. Bank's Chairman of the Board and has been since December 2007; President and has been since October 2004; Chief Executive Officer ("CEO") and has been since December 2006; and a director and has been since 2006.    Defendant Davis is also a member of U.S. Bank's Risk Management Committee[2] and has been since at least March 2007.   Defendant Davis was U.S. Bank's Chief Operating Officer from October 2004 to December 2006 and Vice Chairman from February 2001 to October 2004.   Defendant Davis has also held various management positions since joining Star Banc Corporation, a predecessor to U.S. Bank, in 1993 as Executive Vice President.   Defendant Davis is knowingly, recklessly, or grossly negligently responsible for U.S. Bank's breach of its contractual duties and obligations owed to the Covered Trusts, as well as duties imposed by the TIA.   Defendant Davis also failed to act in good faith and with requisite care when he rejected plaintiff's Demand without even investigating the allegations.   U.S. Bank paid defendant Davis the following compensation as an executive:

---

[2] Prior to 2009, the Risk Management Committee operated as the Credit and Finance Committee.

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| 2010 | $975,037 | - | $9,500,000 | $2,500,000 | $3,115,125 | $2,666,929 | $14,114 | $18,771,205 |
| 2009 | $915,491 | - | $2,500,000 | $2,500,000 | $677,588 | $1,583,391 | $35,376 | $8,211,846 |
| 2008 | $900,034 | - | $850,000 | $5,000,000 | $1,255,500 | $221,462 | $15,596 | $8,242,592 |
| 2007 | $850,032 | - | - | $5,000,000 | | $609,672 | $14,170 | $6,473,874 |
| 2006 | $625,024 | - | $99,678 | $2,421,794 | $1,500,000 | $1,248,437 | $21,563 | $5,916,496 |
| 2005 | $625,024 | $1,750,000 | - | $3,500,000 | - | - | $8,400 | $5,883,424 |

Defendant Davis is a citizen of Minnesota.

21.    Andrew Cecere ("Cecere") is U.S. Bank's Vice Chairman and Chief Financial Officer ("CFO") and has been since February 2007.  Defendant Cecere was also U.S. Bank's Vice Chairman, Wealth Management & Securities Services from February 2001 to February 2007.  Defendant Cecere had previously served as an executive officer of the former U.S. Bank, including as CFO from May 2000 to February 2001.  Defendant Cecere is knowingly, recklessly, or grossly negligently responsible for U.S. Bank's breach of its contractual duties and obligations owed to the Covered Trusts, as well as duties imposed by the TIA.   U.S. Bank paid defendant Cecere the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2010 | $603,773 | - | $5,500,000 | $1,500,000 | $1,313,000 | $918,078 | $13,754 |
| 2009 | $581,819 | - | $1,500,000 | $1,500,000 | $287,083 | $295,184 | $13,662 |
| 2008 | $564,397 | - | $440,000 | $3,000,000 | $525,000 | - | $14,097 |
| 2007 | $445,850 | - | - | $1,750,000 | | $177,356 | $12,432 |
| 2006 | $400,015 | - | $145,028 | $1,337,754 | $625,000 | $100,023 | $12,023 |
| 2005 | $400,015 | $550,000 | - | $1,600,000 | - | - | $8,400 |

Defendant Cecere is a citizen of Minnesota.

22.    Defendant Patrick T. Stokes ("Stokes") is U.S. Bank's Lead Director and has been since January 2011 and a director and has been since 1992.  Defendant Stokes is also Chairman of U.S. Bank's Risk Management Committee and has been since at least

March 2007.  Defendant Stokes was also U.S. Bank's Lead Director in at least 2008.

Defendant Stokes is knowingly, recklessly, or grossly negligently responsible for U.S.

Bank's breach of its contractual duties and obligations owed to the Covered Trusts, as

well as duties imposed by the TIA.  Defendant Stokes also failed to act in good faith and

with requisite care when he rejected plaintiff's Demand without even investigating the

allegations.  U.S. Bank paid defendant Stokes the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $115,000 | $136,668 | - | $251,668 |
| 2009 | $115,000 | $142,584 | - | $257,584 |
| 2008 | $100,000 | $162,251 | $3,711 | $265,962 |
| 2007 | $90,000 | $87,964 | $71,571 | $249,535 |
| 2006 | $80,000 | $90,098 | $79,768 | $249,866 |

Defendant Stokes is a citizen of Missouri.

23.     Defendant O'dell M. Owens ("Owens") is a U.S. Bank director and has

been since 1991.  Defendant Owens is also a member of U.S. Bank's Audit Committee

and has been since at least March 2006.  Defendant Owens was U.S. Bank's Lead

Director in at least 2009 and a member of U.S. Bank's Risk Management Committee

from at least March 2004 to at least March 2005.  Defendant Owens is knowingly,

recklessly, or grossly negligently responsible for U.S. Bank's breach of its contractual

duties and obligations owed to the Covered Trusts, as well as duties imposed by the TIA.

Defendant Owens also failed to act in good faith and with requisite care when he rejected

plaintiff's Demand without even investigating the allegations.  U.S. Bank paid defendant

Owens the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $112,500 | $135,975 | - | $248,475 |
| 2009 | $137,500 | $140,667 | - | $278,167 |
| 2008 | $107,500 | $158,054 | $3,711 | $269,265 |
| 2007 | $97,500 | $87,964 | $71,571 | $257,035 |
| 2006 | $85,000 | $90,098 | $79,874 | $254,972 |

Defendant Owens is a citizen of Ohio.

24.     Defendant Jerry W. Levin ("Levin") is a U.S. Bank director and has been since 1995.  Defendant Levin was also U.S. Bank's Lead Director in at least 2010.  Defendant Levin was a member of U.S. Bank's Risk Management Committee from at least March 2004 to at least March 2005.  Defendant Levin is knowingly, recklessly, or grossly negligently responsible for U.S. Bank's breach of its contractual duties and obligations owed to the Covered Trusts, as well as duties imposed by the TIA.  Defendant Levin also failed to act in good faith and with requisite care when he rejected plaintiff's Demand without even investigating the allegations.  U.S. Bank paid defendant Levin the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $130,000 | $136,668 | - | $266,668 |
| 2009 | $105,000 | $142,584 | - | $247,584 |
| 2008 | $100,000 | $162,251 | $6,898 | $269,149 |
| 2007 | $90,000 | $87,964 | $126,057 | $304,021 |
| 2006 | $90,000 | $90,098 | $141,254 | $321,352 |

Defendant Levin is a citizen of New York.

25.     Defendant Victoria Buyniski Gluckman ("Buyniski Gluckman") is a U.S. Bank director and has been since 1990.  Defendant Buyniski Gluckman was also a member of U.S. Bank's Risk Management Committee from at least March 2005 to at least March 2009.  Defendant Buyniski Gluckman is knowingly, recklessly, or grossly

negligently responsible for U.S. Bank's breach of its contractual duties and obligations owed to the Covered Trusts, as well as duties imposed by the TIA.  Defendant Buyniski Gluckman also failed to act in good faith and with requisite care when she rejected plaintiff's Demand without even investigating the allegations.  U.S. Bank paid defendant Buyniski Gluckman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $90,000 | $137,289 | - | $227,289 |
| 2009 | $90,000 | $141,622 | - | $231,622 |
| 2008 | $90,000 | $158,054 | $3,711 | $251,765 |
| 2007 | $80,000 | $87,964 | $111,572 | $279,536 |
| 2006 | $80,000 | $90,098 | $79,874 | $249,972 |

Defendant Buyniski Gluckman is a citizen of Ohio.

26.    Defendant David B. O'Maley ("O'Maley") is a U.S. Bank director and has been since 1995.  Defendant O'Maley was also a member of U.S. Bank's Risk Management Committee from at least March 2007 to January 2012.  Defendant O'Maley is knowingly, recklessly, or grossly negligently responsible for U.S. Bank's breach of its contractual duties and obligations owed to the Covered Trusts, as well as duties imposed by the TIA.  Defendant O'Maley also failed to act in good faith and with requisite care when he rejected plaintiff's Demand without even investigating the allegations.  U.S. Bank paid defendant O'Maley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $90,000 | $137,143 | - | $227,143 |
| 2009 | $90,000 | $142,372 | - | $232,372 |
| 2008 | $90,000 | $161,777 | $6,897 | $258,674 |
| 2007 | $80,000 | $87,964 | $120,691 | $288,655 |
| 2006 | $90,000 | $90,098 | $140,241 | $320,339 |

Defendant O'Maley is a citizen of Ohio.

27.     Defendant Arthur D. Collins, Jr. ("Collins") is a U.S. Bank director and has been since 1996.  Defendant Collins was also Chairman of U.S. Bank's Risk Management Committee from at least March 2004 to at least March 2006.  Defendant Collins is knowingly, recklessly, or grossly negligently responsible for U.S. Bank's breach of its contractual duties and obligations owed to the Covered Trusts, as well as duties imposed by the TIA.  Defendant Collins also failed to act in good faith and with requisite care when he rejected plaintiff's Demand without even investigating the allegations.   U.S. Bank paid defendant Collins the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
| --- | --- | --- | --- | --- |
| 2010 | $105,000 | $136,668 | - | $241,668 |
| 2009 | $105,000 | $142,584 | - | $247,584 |
| 2008 | $100,000 | $162,251 | $6,898 | $269,149 |
| 2007 | $90,000 | $87,964 | $126,057 | $304,021 |
| 2006 | $90,000 | $90,098 | $141,281 | $321,379 |

Defendant Collins is a citizen of Illinois.

28.     Defendant Joel W. Johnson ("Johnson") is a U.S. Bank director and has been since 1999.  Defendant Johnson is also a member of U.S. Bank's Audit Committee and has been since at least March 2006 and a member of the Risk Management Committee and has been since at least March 2007.  Defendant Johnson is knowingly, recklessly, or grossly negligently responsible for U.S. Bank's breach of its contractual duties and obligations owed to the Covered Trusts, as well as duties imposed by the TIA.  Defendant Johnson also failed to act in good faith and with requisite care when he rejected plaintiff's Demand without even investigating the allegations.   U.S. Bank paid defendant Johnson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $97,500 | $136,564 | - | $234,064 |
| 2009 | $97,500 | $140,667 | - | $238,167 |
| 2008 | $97,500 | $204,008 | $86,381 | $387,889 |
| 2007 | $87,500 | $72,651 | $98,079 | $258,230 |
| 2006 | $85,000 | $53,743 | $76,294 | $215,037 |

Defendant Johnson is a citizen of Arizona.

29.     Defendant Craig D. Schnuck ("Schnuck") is a U.S. Bank director and has been since 2002.  Defendant Schnuck is also a member of U.S. Bank's Risk Management Committee and has been since at least March 2007.  Defendant Schnuck was a member of U.S. Bank's Audit Committee from at least March 2004 to at least March 2006. Defendant Schnuck is knowingly, recklessly, or grossly negligently responsible for U.S. Bank's breach of its contractual duties and obligations owed to the Covered Trusts, as well as duties imposed by the TIA.  Defendant Schnuck also failed to act in good faith and with requisite care when he rejected plaintiff's Demand without even investigating the allegations.   U.S. Bank paid defendant Schnuck the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $90,000 | $138,429 | - | $228,429 |
| 2009 | $90,000 | $143,386 | - | $233,386 |
| 2008 | $90,000 | $190,023 | $100,557 | $380,580 |
| 2007 | $80,000 | $55,547 | $67,150 | $202,697 |
| 2006 | $85,000 | $49,746 | $69,503 | $204,249 |

Defendant Schnuck is a citizen of Missouri.

30.     Defendant Olivia F. Kirtley ("Kirtley") is a U.S. Bank director and has been since 2006.  Defendant Kirtley is also Chairman of U.S. Bank's Audit Committee and has been since at least March 2009 and a member and has been since October 2006.

Defendant Kirtley was Vice Chairman of the Audit Committee from at least March 2007 to at least March 2008. Defendant Kirtley is knowingly, recklessly, or grossly negligently responsible for U.S. Bank's breach of its contractual duties and obligations owed to the Covered Trusts, as well as duties imposed by the TIA. Defendant Kirtley also failed to act in good faith and with requisite care when she rejected Plaintiff's demand without even investigating the allegations. U.S. Bank paid defendant Kirtley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $115,000 | $136,412 | - | $251,412 |
| 2009 | $115,000 | $136,491 | - | $251,491 |
| 2008 | $97,500 | $157,480 | $51,126 | $306,106 |
| 2007 | $87,500 | $20,316 | $28,114 | $135,930 |
| 2006 | $21,250 | $681 | $681 | $22,612 |

Defendant Kirtley is a citizen of Florida.

31.    Defendant Douglas M. Baker, Jr. ("Baker") is a U.S. Bank director and has been since January 2008. Defendant Baker is also a member of U.S. Bank's Audit Committee and has been since April 2008 and a member of the Risk Management Committee and has been since at least March 2010. Defendant Baker is knowingly, recklessly, or grossly negligently responsible for U.S. Bank's breach of its contractual duties and obligations owed to the Covered Trusts, as well as duties imposed by the TIA. Defendant Baker also failed to act in good faith and with requisite care when he rejected plaintiff's Demand without even investigating the allegations. U.S. Bank paid defendant Baker the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $97,500 | $135,993 | $233,493 |
| 2009 | $97,500 | $136,197 | $233,697 |
| 2008 | $88,125 | $124,548 | $212,673 |

Defendant Baker is a citizen of Minnesota.

32.     Defendant Y. Marc Belton ("Belton") is a U.S. Bank director and has been since March 2009.  Defendant Belton is also a member of U.S. Bank's Audit Committee and has been since April 2009.  Defendant Belton is knowingly, recklessly, or grossly negligently responsible for U.S. Bank's breach of its contractual duties and obligations owed to the Covered Trusts, as well as duties imposed by the TIA.  Defendant Belton also failed to act in good faith and with requisite care when he rejected plaintiff's Demand without even investigating the allegations.   U.S. Bank paid defendant Belton the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $97,500 | $132,009 | $229,509 |
| 2009 | $80,300 | $108,953 | $189,253 |

Defendant Belton is a citizen of Minnesota.

33.     Defendant Richard G. Reiten ("Reiten") was a U.S. Bank director from 1998 to April 2012.  Defendant Reiten is also a member of U.S. Bank's Audit Committee from at least 2004 to April 2012 and a member of U.S. Bank's Risk Management Committee from at least March 2004 to at least March 2006.  Defendant Reiten is knowingly, recklessly, or grossly negligently responsible for U.S. Bank's breach of its contractual duties and obligations owed to the Covered Trusts, as well as duties imposed by the TIA.  Defendant Reiten also failed to act in good faith and with requisite care

when he rejected Plaintiff's demand without even investigating the allegations.   U.S. Bank paid defendant Reiten the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $97,500 | $135,975 | - | $233,475 |
| 2009 | $97,500 | $140,667 | - | $238,167 |
| 2008 | $97,500 | $190,929 | $36,584 | $325,013 |
| 2007 | $87,500 | $87,728 | $71,341 | $246,569 |
| 2006 | $85,000 | $62,443 | $51,360 | $198,803 |

Defendant Reiten is a citizen of Oregon.

34.     The defendants identified in ¶¶20-21 are referred to herein as the "Officer Defendants."   The defendants identified in ¶¶20, 22-33 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶23, 28-33 are referred to herein as the "Audit Committee Defendants."   The defendants identified in ¶¶20, 22-29, 31, 33 are referred to herein as the "Risk Management Committee Defendants."   Collectively, the defendants identified in ¶¶20-33 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

35.     By reason of their positions as officers, directors, and/or fiduciaries of U.S. Bank and because of their ability to control the business and corporate affairs of U.S. Bank, the Individual Defendants owed and owe U.S. Bank and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage U.S. Bank in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of U.S. Bank and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

36.     Each officer and director of the Company owes to U.S. Bank and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

**Additional Duties of the Audit Committee Defendants**

37.     Pursuant to the Company's Audit Committee Charter and as described in various Proxy Statements, the Audit Committee Defendants owed specific duties to U.S. Bank in addition to the duties set forth above.   The Audit Committee is and was responsible for overseeing "the Company's compliance with legal and regulatory requirements."   In particular, the Audit Committee is responsible for: (i) reviewing information from internal audit, management, and the independent auditors, as appropriate, concerning the Company's compliance with applicable legal and regulatory requirements; (ii) reviewing the Company's guidelines and policies with respect to risk assessment and risk management; (iii) reviewing the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures; (iv) reviewing any legal matter that could have a significant impact on the Company's financial statements; and (v) reviewing any regulatory, risk or compliance matter with the Company's Chief Risk Officer that could have a significant impact on the Company's financial statements.   The Audit Committee met eight times in 2004 and 2008 – 2010, nine times in 2005 – 2006 and 2010 – 2011, and ten times in 2007.

**Additional Duties of the Risk Management Committee Defendants**

38.     Pursuant to the Company's Risk Management Committee Charter and as described in various Proxy Statements, the Risk Management Committee Defendants owed additional specific duties to U.S. Bank.  The Risk Management Committee is and was responsible for overseeing "the risk management function of the Company, including its policies, procedures and practices relating to management of credit risk; financial, liquidity and market risk; and operational risk."  In particular, the Risk Management Committee is responsible for: (i) reviewing and approving significant policies relating to regulatory compliance and operational risk management and any substantive changes made to those policies following approval; (ii) reviewing significant compliance and operational risk matters and the status of management's response to any noted issues; (iii) reviewing significant regulatory recommendations and the status of management's response to any noted issues; and (iv) overseeing management's identification of and responses to circumstances that potentially pose significant reputational risks to the Company.

39.     The Risk Management Committee met six times in 2004 and 2011, seven times in 2007 and 2010, eight times in 2008, nine times in 2009, eleven times in 2005, and twelve times in 2006.

**Control, Access, and Authority**

40.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of U.S. Bank, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

41.     Because of their advisory, executive, managerial, and directorial positions with U.S. Bank, each of the Individual Defendants had access to information concerning the duties and obligations of the Company in connection with the Covered Trusts and the Company's continuing failure to fulfill such duties and obligations.

42.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of U.S. Bank, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

43.     To discharge their duties, the officers and directors of U.S. Bank were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of U.S. Bank were required to, among other things:

(a)     ensure that the Company complied with its legal and contractual obligations and requirements;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how U.S. Bank conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such

conditions or practices and make such disclosures as necessary to comply with securities laws; and

(d)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breaches of Duties**

44.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of U.S. Bank, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of U.S. Bank's Board.

45.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to breach its duties to the Covered Trusts by: (i) failing to take physical possession of the Mortgage Loan files and all of the key documents for each of the Mortgage Loans included in the Covered Trusts and to hold them for the benefit of the investors; (ii) failing to review

each of the Mortgage Loan files; (iii) failing to complete adequate interim and final certifications of the files; (iv) failing to notify EMC Mortgage Corporation ("EMC") of those Mortgage Loans that had missing, defective, or incomplete documents; and (v) failing to timely enforce EMC's obligation to cure, substitute, or repurchase the defective loans.

46.     The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct, the Company is now the subject of at least two class action lawsuits that allege breach of contract and violations of TIA.  As a result, U.S. Bank has expended, and will continue to expend, significant sums of money.

47.     Finally, the members of the Board breached their fiduciary duty by refusing to even investigate the Demand.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

48.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including investors in the Covered Trusts, regarding the Company's

compliance with its responsibilities; and (ii) enhance the Individual Defendants' executive and directorial positions at U.S. Bank and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

50. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

51. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

52. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

I.  **THE SECURITIZATION PROCESS FOR THE BEAR, STEARNS & CO. AND WASHINGTON MUTUAL BANK MBS**

53.     Mortgage securitizations are created through conversions of whole mortgage loans into bond-like instruments, commonly referred to as MBS.  The MBS are traded over the counter in capital markets. U.S. Bank served as trustee for several MBS transactions, sometimes serving as the original trustee and other times obtaining its trustee status as successor-in-interest.

54.     The securitization of the Mortgage Loans in the Covered Trusts, and in countless other MBS trusts, was typically managed by Bear, Stearns & Co. ("Bear Sterns") and its affiliates or Washington Mutual Bank ("WaMu") and its affiliates.  The process for creating MBS is complex and involves several steps.  For simplicity, the typical process for the relevant Bear Stearns MBS is outlined below.

55.     First, Bear Stearns, through its corporate affiliates, including Bear Stearns Residential Mortgage Corporation and EMC, originated Mortgages or purchased Mortgages that were originated by other large third-party lenders, some of which received financing from Bear Stearns.

56.     Second, Bear Stearns grouped the Mortgages that it had originated and purchased into a large pool and then transferred or sold the pool to a "Depositor" (generally a shell entity owned or controlled by Bear Stearns).  The primary role of the Depositor is to provide an intermediary between the "Seller" (usually EMC, which is another Bear Stearns entity) and the Covered Trusts in the chain of title to the Mortgage Loans.  Thus, if the Seller goes into bankruptcy, the bankruptcy estate can rescind direct

transfers made by the Seller through the Depositor.  As a result, the Seller and the Depositor enter into a Mortgage Loan Purchase Agreement ("MLPA"), which governs the mechanics of the transfer, and states that ***the Mortgage Loan files must be complete and may not have defective documents, such as imperfect assignments or endorsements***.  The MLPA further includes: (i) representations and warranties from the Seller concerning the quality of the Mortgage Loans in the Mortgage pool; (ii) promises from the Seller to cure, substitute, or repurchase Mortgages that do not comply with those representations and warranties, or that do not have a valid transfer; and (iii) statements that the trustee, U.S. Bank, will ultimately have the right to enforce those representations and promises.

57.     Third, the Depositor transferred the pool of Mortgages to U.S. Bank, for the benefit of the Covered Trusts and the MBS holders, and in exchange U.S. Bank transferred the MBS to the Depositor.   Incorporating the MLPA, the Governing Agreements set forth the terms of this transfer and of the operation of the Covered Trusts, and further impose certain duties on the trustee, in addition to those duties imposed by the TIA and state law. The Governing Agreements also establish the Covered Trusts as a Real Estate Mortgage Investment Conduit ("REMIC") under the Internal Revenue Code, which enables the Covered Trusts to avoid tax liability on income generated from the underlying Mortgage Loans, but only if the Covered Trusts gain valid title over the underlying Mortgage Loans within three months of its creation and if certain other criteria are met.  Qualifying as a REMIC is critical to the Covered Trusts' ability to make the payments promised to MBS holders.

58. Fourth, the Depositor sold the MBS to an underwriter (again, typically another Bear Stearns entity) to be marketed and sold to investors. The money the Seller received from the sale to the underwriter could have been used to originate or purchase more Mortgages. The Seller is also sometimes referred to as the Sponsor.[3]

59. MBS entitle their holders to the cash flows generated from the Covered Trusts' pool of Mortgage Loans. The Covered Trusts, or securitization transactions, are structured such that the risk of loss is divided among different "tranches" with varying levels of credit risk and reward. For example, senior tranches have priority to payment in the event the Covered Trusts suffer losses, have lower interest rates than junior tranches, and different MBS correspond to those different tranches. The "Master Servicer" is responsible for the collection of payments from the underlying mortgagors after the sale of the MBS, including through foreclosure if necessary, and the payments are distributed to the MBS holders in accordance with the tranche structure.

60. The value of MBS and their credit rating are largely dependent on the riskiness of the underlying Mortgages and on the Covered Trusts' ability to foreclose on the collateral and recover the unpaid loan balance when necessary. The riskiness of the underlying Mortgages is dependent on the Seller's representations and warranties concerning the quality of the loans in the pool. If the loans underlying MBS suffer

_____

[3] The process for WaMu MBS is substantially similar to the process for Bear Stearns MBS, but with WaMu and its affiliates acting as the Seller and Depositor instead of Bear Stearns and its affiliates. Further, for WaMu MBS, U.S. Bank was not the original trustee, but rather assumed its duties and obligations as successor to Bank of America Corp. as trustee, which became trustee as successor-in-interest by merger with LaSalle Bank National Association.

payment defaults in excess of the assumptions built into their credit enhancement and securities' ratings, or the underlying properties' Mortgages cannot be effectively foreclosed and the properties sold at sufficient prices following default, the securities will be re-rated and the value of the MBS will decline.

## II.    U.S. BANK'S DUTIES AS TRUSTEE FOR THE COVERED TRUSTS

61.    The trustee in MBS securitization serves to ensure that there is at least one independent party to the Governing Agreements who can effectively protect the Covered Trusts and the MBS holders.  Thus, as the Individual Defendants were well aware, the Governing Agreements imposed critical duties on U.S. Bank, as trustee, that had a direct impact on the value of the MBS.

62.    The Governing Agreements set forth the trustee's duties and the majority of the Covered Trusts are governed by a Pooling Service Agreement ("PSA") and certain related agreements that the PSA references and incorporates, including the Governing Agreements.  All of the Governing Agreements for the Covered Trusts are substantially similar.

63.    Recognizing that previous abuses by trustees have adversely affected the national interest in spite of the rights and responsibilities set forth in the Governing Agreements, Congress enacted the TIA to provide minimum federal protections to investors which are deemed to be incorporated into those Governing Agreements.

A.     **U.S. Bank's Duties and Obligations Under the Governing Agreements as Trustee for the Bear Stearns MBS**

1.     **U.S. Bank Had the Duty to Properly Take Title to the Mortgage Loans Conveyed to the Covered Trusts**

64.     Like all MBS, the Bear Stearns MBS only have value if they are backed by Mortgage Loans in which the Covered Trusts have taken title to the Mortgages that are conveyed to them for due consideration. The Governing Agreements are therefore intended to ensure that the trustee, on behalf of the Covered Trusts, in fact, takes title to the Mortgage Loans.

65.     As set forth in PSA section 2.01(a),  "Conveyance of Mortgage Loans to Trustee from a typical Bear Stearns MBS," the Depositor assigns, among other things, its rights under the MLPA (the document through which the Depositor acquired the Mortgage Loans from the Seller) to the trustee.  Specifically, in relevant part:

> The Depositor concurrently with the execution and delivery of this Agreement, sells, transfers and assigns to the Trust without recourse all its right, title and interest in and to (i) the Mortgage Loans identified in their respective Mortgage Loan Schedules, including all interest and principal due with respect to the Mortgage Loans … (ii) such assets as shall from time to time be credited or are required by the terms of this Agreement to be credited to the Master Servicer Collection Account, … (vi) the Mortgage Loan Purchase Agreement to the extent provided in Subsection 2.03(a), (vii) the rights with respect to the Servicing Agreements as assigned to the Trustee on behalf of the Certificateholders by the Assignment Agreements, (viii) such assets as shall from time to time be credited or are required by the terms of this Agreement to be credited to the Distribution Account and (ix) any proceeds of the foregoing.

*See also* Indenture §6.01(b)(i); Sale and Servicing Agreement ("SSA") §2.01(a).[4]

---

[4] All cites to the Indenture and its related agreements are to the Indenture and related agreements for Bear Stearns ARM Trust 2005-9, which, as set forth above, are substantially similar to the Governing Agreements for all of the Covered Trusts.

66.     Significantly, through its agent, U.S. Bank was required to take physical possession of the Mortgage files, including the Mortgage Note and the Mortgage, properly endorsed and assigned to the trustee. As set forth in PSA section 2.01(b):

> In connection with the above transfer and assignment, the Depositor hereby delivers to the Custodian, as agent for the Trustee, with respect to each Mortgage Loan:
>
>> (i) the original Mortgage Note, endorsed without recourse (A) to the order of the Trustee, or (B) in the case of a loan registered on the [Mortgage Electronics Registration Systems, Inc. ("MERS")] system, in blank, and in each case showing an unbroken chain of endorsements from the originator thereof to the Person endorsing it to the Trustee, or lost note affidavit together with a copy of the related Mortgage Note;
>>
>> (ii) the original Mortgage and, if the related Mortgage Loan is a [MERS] Loan, noting the presence of the [MERS identification number] and language indicating that such Mortgage Loan is a [MERS] Loan, which shall have been recorded (or if the original is not available, a copy), with evidence of such recording indicated thereon…;
>>
>> (iii) unless the Mortgage Loan is a [MERS] Loan, a certified copy of the assignment (which may be in the form of a blanket assignment if permitted in the jurisdiction in which the Mortgaged Property is located) to "U.S. Bank National Association, as Trustee", with evidence of recording with respect to each Mortgage Loan in the name of the Trustee thereon….

*See also*  Indenture §6.01(b)(i); SSA §2.01(b).

67.     In addition, section 2.02(a) of the PSA, "Acceptance of Mortgage Loans by Trustee," reinforces that U.S. Bank or its agent must take physical possession of the Mortgage Loans and the accompanying loan files for the exclusive use and benefit of all current and future MBS holders.  It provides:

> The Trustee acknowledges the sale, transfer and assignment of the Trust Fund to it by the Depositor and receipt of, subject to further review and the exceptions which may be noted pursuant to the procedures described

below, and declares that it holds, the documents (or certified copies thereof) delivered to the Custodian, as its agent, pursuant to Section 2.01, and declares that it will continue to hold those documents and any amendments, replacements or supplements thereto and all other assets of the Trust Fund delivered to it as Trustee in trust for the use and benefit of all present and future Holders of the Certificates.

*See also* Indenture §6.01(b)(i); SSA §2.02(a).

### 2.    U.S. Bank Had a Duty to Review the Mortgage Loan Files Conveyed to the Covered Trusts and to Identify Files with Missing, Defective, or Incomplete Documents

68.    The Governing Agreements also required U.S. Bank or its agent to review the loan files for each of the Mortgage Loans and to certify that the documentation for each of the loans was accurate and complete.  This duty ensures that the Mortgage Loans were properly conveyed to the Covered Trusts.  Accordingly, as set forth in PSA section 2.02(a), U.S. Bank or its agent was required to create an "Interim Certification" as follows:

No later than 90 days after the Closing Date (or with respect to any Substitute Mortgage Loan, within five Business Days after the receipt by the Trustee or Custodian thereof), the Trustee agrees, for the benefit of the Certificateholders, to review or cause to be reviewed by the Custodian on its behalf (under the Custodial Agreement), each Mortgage File delivered to it and to execute and deliver, or cause to be executed and delivered, to the Depositor and the Trustee an Interim Certification.  In conducting such review, the Trustee or Custodian will ascertain whether all required documents have been executed and received, and based on the related Mortgage Loan Schedule, whether those documents relate, determined on the basis of the Mortgagor name, original principal balance and loan number, to the Mortgage Loans it has received, as identified in the related Mortgage Loan Schedule.

*See also* Indenture §6.01(b)(i); SSA §2.02(a).

69.    Similarly, U.S. Bank had to complete a "Final Certification" as set forth in PSA section 2.02(b):

No later than 180 days after the Closing Date (or with respect to any Substitute Mortgage Loan, within five Business Days after the receipt by the Trustee or Custodian thereof), the Trustee or the Custodian, as its agent, will review, for the benefit of the Certificateholders, the Mortgage Files delivered to it and will execute and deliver or cause to be executed and delivered to the Depositor and the Trustee a Final Certification. In conducting such review, the Trustee or the Custodian, as its agent, will ascertain whether an original of each document required to be recorded has been returned from the recording office with evidence of recording thereon or a certified copy has been obtained from the recording office.

*See also* Indenture §6.01(b)(i); SSA §2.02(b).

> **3.     U.S. Bank Had a Duty to Enforce the Seller's Obligation to Cure, Substitute or Repurchase Mortgage Loans for Files with Missing, Defective, or Incomplete Documents**

70.     The quality of the Mortgage Loans in the MBS is an important factor which is determined by ratings agencies. The quality is based on the representations and warranties contained in the Governing Agreements and the ratings agencies must be informed in the event that the underlying Mortgage Loans are substituted or repurchased, which would generally only happen if they are in breach of the representations and warranties.

71.     The Governing Agreements therefore require the Seller to cure, substitute, or repurchase any Mortgage Loans that did not have compete Mortgage Files or that materially breach the Seller's representations and warranties concerning the quality of the Mortgage Loans conveyed to the Covered Trusts. Importantly, they also required U.S. Bank as the trustee, among others, to enforce the Seller's obligation. This requirement is set forth in several provisions of the Governing Agreements, including section 2.02(a) of the PSA, which states that, as part of the Interim Certification:

If the Trustee or the Custodian, as its agent, finds any document constituting part of the Mortgage File has not been executed or received, or

to be unrelated determined on the basis of the Mortgagor name, original principal balance and loan number, to the Mortgage Loans identified in Exhibit B, or to appear defective on its face (a "Material Defect"), the Trustee or the Custodian, as its agent, shall promptly notify the Seller.  In accordance with the Mortgage Loan Purchase Agreement, the Seller shall correct or cure any such defect within ninety (90) days from the date of notice from the Trustee or the Custodian, as its agent, of the defect and if the Seller fails to correct or cure the defect within such period, and such defect materially and adversely affects the interests of the Certificate holders in the related Mortgage Loan, the Trustee shall enforce the Seller's obligation under the Mortgage Loan Purchase Agreement, within 90 days from the Trustee's or the Custodian's notification, provide a Substitute Mortgage Loan (if within two years of the Closing Date) or purchase such Mortgage Loan at the Repurchase Price….

*See also* Indenture §6.01(b)(i); SSA §2.02(a).

72.     Similarly, section 2.02(b) of the PSA repeats that duty in connection with the Final Certification, and states:

If the Trustee or the Custodian, as its agent, finds a Material Defect, the Trustee or the Custodian, as its agent, shall promptly notify the Seller….  In accordance with the Mortgage Loan Purchase Agreement, the Seller shall correct or cure any such defect within 90 days from the date of notice from the Trustee or the Custodian, as its agent, of the Material Defect and if the Seller is unable to cure such defect within such period, and if such defect materially and adversely affects the interests of the Certificateholders in the related Mortgage Loan, the Trustee shall enforce the Seller's obligation under the Mortgage Loan Purchase Agreement, within 90 days from the Trustee's Custodian's notification, provide a Substitute Mortgage Loan (if within two years of the Closing Date) or purchase such Mortgage Loan at the Repurchase Price….

*See also* Indenture §6.01(b)(i); SSA §2.02(b).

73.     U.S. Bank, as the Trustee, also had the duty to enforce the Seller's obligation to cure, substitute, or repurchase defective Mortgage Loans at any point that a breach of the Seller's representations and warranties is discovered. As set forth in PSA section 2.03(b), "Assignment of Interest in the Mortgage Loan Purchase Agreement":

If the Depositor, the Securities Administrator or the Trustee discovers a breach of any of the representations and warranties set forth in the Mortgage Loan Purchase Agreement, which breach materially and adversely affects the value of the interests of the Certificateholders or the Trustee in the related Mortgage Loan, the party discovering the breach shall give prompt written notice of the breach to the other parties. The Seller, within 90 days of its discovery or receipt of notice that such breach has occurred (whichever occurs earlier), shall cure the breach in all material respects or, subject to the Mortgage Loan Purchase Agreement or Section 2.04 of this Agreement, as applicable, shall purchase the Mortgage Loan or any property acquired with respect thereto from the Trustee.…

*See also* Indenture §6.01(b)(i); SSA §2.03(b).

### B.     U.S. Bank's Duties and Obligations Under the Governing Agreements as Trustee for the WaMu MBS

#### 1.     U.S. Bank Had the Duty to Properly Take Title to the Mortgage Loans Conveyed to the Trust

74.     As with the Bear Stearns MBS, the governing agreements for the WaMu MBS required the trustee or its agent to take physical possession of the Mortgage files evidencing the Covered Trusts' ownership of the Mortgage Loans conveyed to it, including the Mortgage, properly endorsed and assigned as specified by the relevant PSA. As set forth in PSA section 2.05 for a typical WaMu PSA, as Depositor, WaMu affiliate Washington Mutual Asset Acceptance Corp. ("WAAC"), was required to "deliver to and deposit with, or cause to be delivered to and deposited with, the Trustee … the Mortgage Files, which shall at all times be identified in the records of the Trustee … as being held by or on behalf of the Trust."

75.     In addition, WaMu PSA Section 2.07, "Acceptance by Trustee," reinforces that the trustee or its agent was required to take physical possession of the Mortgage files for the exclusive use and benefit of all current and future MBS holders.  It provides in relevant part:

> The Trustee acknowledges receipt ... on behalf of the Trust of the documents (or certified copies thereof as specified in Section 2.05) referred to in Section 2.05 above....

76.    Likewise, WaMu PSA Section 2.11, "Acknowledgement of Transfer of Mortgage Pool Assets," states that:

> The Trustee hereby acknowledges and accepts on behalf of the Trust the transfer and assignment pursuant to Section 2.04 to the Trust of the Mortgage Pool Assets ... and declares that as of the Closing Date it… holds and shall hold any documents constituting part of the Mortgage Pool Assets, and the Mortgage Pool Assets, as Trustee in trust, upon the trust herein set forth....

77.    Similarly WaMu, PSA section 8.08 ("Successor Trustee") provides in relevant part that:

> The predecessor shall deliver to the successor trustee all Mortgage Files, related documents, statements and all other property held by it hereunder, and the Servicer and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

      **2.**      **U.S. Bank Had a Duty to Review the Mortgage Loan Files Conveyed to the Covered Trusts and to Identify Files with Missing, Defective, or Incomplete Documents**

78.    To ensure that the Mortgage Loans were properly conveyed to the Covered Trusts, and that the Covered Trusts had received perfected and enforceable title to the Mortgage Loans, the Governing Agreements also required the trustee or its agent to review the Mortgage files for each of the Mortgage Loans, to identify those loans lacking a complete chain of title or missing documentation, and to certify that the documentation for each of the remaining loans was accurate and complete. This duty overlaps with and forms part of the requirements that the trustee must satisfy to properly take title to the Mortgage Loans.

79.     Accordingly, as set forth in WaMu PSA section 2.07, the trustee or its

agent had to create a "Certification" for the purpose of notifying the servicer of deficient

Mortgage files as follows:

> The Trustee shall review ... each Mortgage File within 45 days after the
> Closing Date and deliver to [WAAC] a certification ... to the effect that,
> except as noted, all documents required … pursuant to the definition of
> "Mortgage File" and Section 2.05 have been executed and received, and
> that such documents relate to the Mortgage Loans identified in the
> Mortgage Loan Schedule.

The exceptions attached to the Certification constitute notice of document deficiencies

and upon being notified of any exceptions, the servicer was required to notify the Seller,

who then must timely cure the exceptions or substitute or repurchase the defective

Mortgage Loans.

80.     WaMu PSA section 2.07 embodies this requirement, stating in relevant

part:

> If the Trustee finds any document or documents required to be included in
> the Mortgage File for a Mortgage Loan pursuant to the definition of
> "Mortgage File" not to have been executed and received, the Trustee shall
> promptly so notify the Servicer…. Upon notice from the Trustee ... that any
> document required to be included in the Mortgage File for a Mortgage Loan
> has not been executed and received, the Servicer shall promptly notify the
> Seller of such defect and take appropriate steps on behalf of the Trust to
> enforce the Seller's obligation, pursuant to Section 2.4 of the Mortgage
> Loan Purchase Agreement, to correct or cure such defect or repurchase or
> substitute for such Mortgage Loan, in accordance with and subject to the
> time limitations set forth in such Section 2.4….

### 3.     U.S. Bank Had a Duty to Enforce the Seller's Obligation to Cure, Substitute or Repurchase Mortgage Loans for Files with Missing, Defective, or Incomplete Documents

81.     The servicer has the duty to enforce the Seller's respective obligations to

cure, substitute, or repurchase defective Mortgage Loans at any point that a breach of the

Seller's representations and warranties concerning the Mortgage Loans set forth in the

MLPA is "discovered," including by the trustee who must then give written notice to the servicer and the Seller.  Of particular importance, as set forth in WaMu PSA section 2.09, "Representations and Warranties of the Seller Concerning the Mortgage Loans":

> Upon discovery by [WAAC], the Servicer or the Trustee (in the case of the Trustee, having actual knowledge thereof) of a breach of any of the representations … set forth in Section 3.1 of the Mortgage Loan Purchase Agreement ... that materially and adversely affects the value of the related Mortgage Loans or the interests of the Trust in the related Mortgage Loans, the party discovering such breach shall give prompt written notice to the others…. The Servicer shall promptly notify the Seller of such breach and take appropriate steps on behalf of the Trust to enforce the Seller's obligation, pursuant to Section 3.3 of the Mortgage Loan Purchase Agreement, to cure such breach in all material respects or repurchase or substitute for the affected Mortgage Loan or Mortgage Loans or any property acquired in respect thereof….

82.     If the servicer does not then act to require the Seller to cure or repurchase, an "event of default" occurs. When an "event of default" occurs, the trustee is required to act prudently to protect the Covered Trusts and MBS holders as required by a typical WaMu PSA.  WaMu PSA section 7.0l(a)(ii) provides that an event of default occurs upon:

> Failure on the part of the Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer contained in the Certificates or in this Agreement which continues unremedied for a period of 60 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Trustee, or to the Servicer and the Trustee by the Holders of Certificates evidencing Percentage Interests aggregating not less than 25% of REMIC III.

83.     Pursuant to WaMu PSA section 8.01(a), once an event of default has occurred, the trustee then assumes the duty to use all his powers under the PSA and at law to protect the Covered Trusts and MBS holders, as a prudent person would in

operating his own affairs. If the trustee fails to provide the notice of breaches it discovers, it cannot rely on its own failure to provide notice to avoid the occurrence of an event of default.

### C.     U.S. Bank Owed Additional Duties and Obligations Under the TIA

84.     The TIA imposes two sets of duties and obligations on U.S. Bank as trustee of the Covered Trusts, including one set "prior to default," and the other set "in case of default."  Prior to default, a trustee must perform "such duties as are specifically set out in [the] indenture," (the instrument governing the trust).   15 U.S.C. §77ooo(a)(1). Thus, U.S. Bank was required to perform the duties specifically assigned to it under the Governing Agreements, including those duties described above.

85.     Also, prior to default, U.S. Bank was required to "examine the evidence furnished to it [by obligors of the Indenture, certifying, among other things, their compliance with conditions and covenants provided for in the Indenture,] to determine whether or not such evidence conforms to the requirements of the indenture."  15 U.S.C. §77ooo(a) (citing 15 U.S.C. §77nnn).   Accordingly, U.S. Bank had to, among other things, examine the evidence that the Master Servicer (often a bank), provided to the Covered Trusts and certify its compliance with the covenants it made under the Governing Agreements.   U.S. Bank also had to determine whether that evidence conformed to the requirements of the Governing Agreements.

86.     In addition, U.S. Bank was required to "give to the indenture security holders … notice of all defaults known to the trustee, within ninety days after the occurrence thereof…." 15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).   Further,

U.S. Bank was required to inform MBS holders of any breaches of the Governing Agreements within ninety days after their occurrence.

87.    In case of a default, U.S. Bank was required to exercise "such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."  15 U.S.C. §77ooo(c).

88.    In direct contrast to the provisions described above, as detailed below, defendants caused or allowed U.S. Bank to fail to exercise its rights and powers under the Governing Agreements as a prudent person, including by failing to take any action in the face of numerous default events.

## II.    THE COVERED TRUSTS SUFFERED FROM SERIOUS WELL KNOWN DEFECTS THAT THE INDIVIDUAL DEFENDANTS IGNORED

89.    As detailed above, as Trustee for the Covered Trusts, U.S. Bank had a duty to enforce the Seller's obligation to cure, substitute, or repurchase defective Mortgage Loans *at any point that a breach of the Seller's representations and warranties is discovered*.  Nevertheless, as detailed below, the Individual Defendants ignored numerous red flags demonstrating that the Bear Stearns and WaMu MBS suffered from serious defects, and made no effort to enforce the Sellers' obligations to correct the defects.

### A.    The Individual Defendants Knew that Serious Defects Have Long Plagued Bear Stearns MBS Securitizations

90.    Following Bear Stearns' 2008 collapse, numerous public and private investigations, along with numerous media reports, have revealed that the Mortgage

Loans Bear Stearns securitized regularly breached the representations and warranties Bear Stearns (and its affiliate EMC) made to securitization trusts and trustees.  Insurers that guaranteed payments for holders of certain Bear Stearns MBS Covered Trusts have brought multiple cases against Bear Stearns and its affiliates, which were prompted by the high rates of defaults in the Covered Trusts.  These insurers were induced to provide coverage based on representations and warranties that Bear Stearns and its affiliates made to them, which were substantially similar to the representations and warranties made to the Covered Trusts.  All of the insurers found shockingly high breach rates with roughly 90% of the Mortgage Loans per Covered Trust failing to comply with the representations and warranties, as detailed in *Ambac Assurance Corp. v. EMC Mortgage Corp.*, No. 1:08-cv-09464-RMB (S.D.N.Y.); *Syncora Guarantee Inc. v. EMC Mortgage Corp.*, No. 1:09-cv-03106-PAC (S.D.N.Y.); and *Assured Guaranty Corp. v. EMC Mortgage Corp.*, No. 1:10-cv-05367-NRB (S.D.N.Y.).

91.    Numerous additional suits brought by investors, based on investigations and extensive analyses, demonstrate that Bear Stearns (and its affiliate EMC) commonly breached representations and warranties regarding the Mortgage Loans conveyed to the Bear Stearns MBS Covered Trusts at the same 90% rate described above.  *E.g.*, *Federal Home Loan Bank of Seattle v. Bear Stearns & Co., Inc., et al.*, No. 2:10-cv-00151-RSM (W.D. Wa.) (since remanded back to state court); *Federal Home Loan Bank of San Francisco v. Credit Suisse Sec. (USA) LLC, et al.*, No. CGC-10-497840 (Cal. Super. Ct.) (naming various Bear Stearns entities as defendants); *Allstate Bank, et al. v. JPMorgan Chase Bank, N.A.*, No. 650398/2011 (N.Y. Sup. Ct.) (same).

92.     Despite defendants' knowledge of widespread defaults for Bear Stearns MBS, defendants did nothing to ensure that U.S. Bank acted in accordance with its obligations as trustee under the Governing Agreements and TIA to enforce EMC's obligation to cure, substitute, or repurchase defective Mortgage Loans once a breach of the Seller's representations and warranties was or should have been discovered.

**B.      The Individual Defendants Knew that Serious Defects Have Long Plagued WaMu MBS Securitizations**

93.     Beginning as early as 2007, multiple, well-publicized public and private investigations have confirmed that WaMu systemically violated both legal requirements and its own underwriting guidelines for the origination and transfer of its Mortgage Loans, including those which it securitized.  For example, in November 2007, in a suit filed against eAppraiseIT LLC and its parent, title insurance company First American Corp. ("First American"), the New York Attorney General alleged that First American was pressured by WaMu to inflate home values in appraisals. The following week, *The Wall Street Journal* disclosed that the U.S. Securities and Exchange Commission had opened an inquiry into whether WaMu had accurately disclosed to buyers of its MBS how its loans were appraised.

94.     By June and July 2008, monthly reports published by trustees for WaMu MBS securitizations started to show substantial increases in the WaMu Mortgage Loan delinquencies.  At the same time, the ratings agencies began to re-rate certain of the Covered Trusts' certificates, and WaMu began reporting severe losses in the credit performance of the Mortgage Loans it had originated and held on its own books.

95.     A steady stream of public disclosures regarding WaMu's systematic underwriting abuses followed shortly thereafter.  For example, in May 2008, WaMu was sued for securities fraud in connection with its statements about its own mortgage loan credit losses.  Subsequently, on August 1, 2008, the first in a series of lawsuits brought under the Securities Act of 1933 for misrepresentations in the offering documents for WaMu's MBS was filed. On September 25, 2008 the Federal Deposit Insurance Corporation ("FDIC") seized WaMu and, pursuant to a Purchase and Assumption ("P&A") agreement signed that same day, sold to JPMorgan Chase ("JPMC") WaMu's banking operations, in a "whole bank" sales transaction.

96.     According to the Majority and Minority Staff Report of the Permanent Subcommittee on Investigations of the U.S. Senate's Committee on Homeland Security and Government Affairs (the "Senate Staff Report"), WaMu "polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss."  In addition, the Senate Staff Report found that WaMu "securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors to whom it sold the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered and known to the bank." WaMu's "mortgage backed securities were among the worst performing in the marketplace due to poor quality loans that incurred early payment defaults, fraud, and high delinquency rates."  Shockingly, the Senate Staff Report found that WaMu securitized not just poor quality loans, but also loans that its own personnel had flagged as containing fraudulent information.

97.    Despite defendants' knowledge of widespread defaults for WaMu MBS, defendants did nothing to ensure that U.S. Bank acted in accordance with its obligations as trustee under the Governing Agreements and TIA to enforce WaMu's obligation to cure, substitute, or repurchase defective Mortgage Loans once a breach of the Seller's representations and warranties was or should have been discovered.

**C.    Defendants Have Long Known that MBS Are Essentially Worthless Without Title Transfer, Yet Failed to Implement a System to Ensure Proper Title Transfer**

98.    The requirement for Covered Trusts to obtain perfect title is a well-known legal necessity for MBS securities. As detailed in a November 2010 Congressional Oversight Report, several states have acted to prohibit, or limit, the foreclosure of Mortgages with irregularities that are similar to the irregularities in Mortgage Loans underlying the Covered Trusts:

- In New York, the court system now requires that those initiating residential foreclosure actions must file a new affirmation to certify that an appropriate employee has personally reviewed the documents and papers filed in the case and confirmed both the factual accuracy of these court filings and the accuracy of the notarizations contained therein.

- In California, a non-judicial foreclosure state, the attorney general sent a letter to JPMorgan Chase demanding that the firm stop all foreclosures unless it could demonstrate that all foreclosures had been conducted in accordance with California law. The attorney general also called on all other lenders to halt foreclosures unless they can demonstrate compliance with California law.

- In Arizona, which is also a non-judicial foreclosure state, the attorney general sent letters on October 7, 2010 to several servicers implicated in the robo-signing scandals to demand a description of their practices and any remedial actions taken to address potential paperwork irregularities. The attorney general wrote that if any employees or agents used any of the questionable practices in connection with conducting a trustee's sale or a foreclosure in

Arizona, such use would likely constitute a violation of the Arizona Consumer Fraud Act, and the attorney general would have to take appropriate action.

- In Ohio, in addition to his lawsuit against GMAC, the attorney general filed an *amicus curiae* brief in an individual foreclosure case asking the court to consider evidence that GMAC committed fraud that tainted the entire judicial process and to consider sanctioning GMAC. The attorney general also sent a letter to 133 Ohio judges asking them for information on any cases involving the robo-signer Xee Moua. In addition, he asked Wells Fargo Bank to vacate any foreclosure judgments in Ohio based on documents that were signed by robo-signers and to stop the sales of repossessed properties.

- In The District of Columbia, Attorney General Peter Nickles announced on October 27, 2010 that foreclosures cannot proceed in the District of Columbia unless a mortgage deed and all assignments of the deed are recorded in public land records, and that foreclosures relying on MERS would not satisfy the requirement. MERS responded the next day by issuing a statement that their procedures conform to the laws of the District of Columbia and encouraged their members to contact them if they experience problems with their foreclosures.

- In Connecticut, the attorney general started investigating GMAC/Ally and demanded that the company halt all foreclosures. He also asked the company to provide specific information relating to its foreclosure practices. In addition, the attorney general asked the state Judicial Department on October 1, 2010 to freeze all home foreclosures for 60 days to allow time to institute measures to assure the integrity of document filings. The Judicial Department refused this request.

99.    Similarly, a November 2010 report by New Jersey Legal Services to the New Jersey Supreme Court documenting irregularities in foreclosure proceedings and supported by extensive depositions and documentary evidence explained:

A foreclosing plaintiff must show (1) that it holds the note, and (2) that the mortgage was either made to it or assigned to it in writing. N.J.S.A. 46:9-9. ***Lenders no longer routinely execute or record Assignments of Mortgage when a loan is transferred because they regard it as unnecessary unless there is a default and too costly and time consuming to do in every***

*case*.... So typically at the time the lender makes a decision to foreclose it is not the record mortgagee. To correct that defect, the attorney for the foreclosing mortgagee or the servicer of the loan will create an Assignment of Mortgage for the purposes of litigation which is in turn signed by a robo-signer. Documents recorded with a public official are self executing and have special evidential status and therefore are especially pernicious. Usually the assignment purports not only to assign the mortgage but also the note or underlying obligation. ***The assignment of the note nearly always contradicts other documents which indicate that the note was transferred at different times and in different manners or not at all.***

100.   The New Jersey Legal Services report noted that one of the flawed practices for assigning Mortgages included assignments that appeared to have been executed and notarized in blank – a practice that appears to have been common for U.S. Bank in the transfer of the Covered Trusts.

101.   In April 2011, the Federal Reserve System, the FDIC, the Office of Thrift Supervision ("OTS"), and the Office of the Comptroller of the Currency ("OCC") issued a joint report entitled "Interagency Review of Foreclosure Policies and Practices" which further confirmed these abuses. For this report, federal regulators reviewed a sampling of the Mortgage Loan files belonging to fourteen Mortgage Loan servicers that had signed consent orders with the federal regulators in April 2011. U.S. Bank, which acted as servicer for MBS Covered Trusts, was included in the review. Based on on-site reviews of foreclosure processing at fourteen federally-regulated mortgage servicers during the fourth quarter of 2010, as noted in the report, the Federal Reserve System, the OCC, the FDIC, and the OTS, found that there may be "***disputes over note ownership or authority to foreclose***." The regulators also noted "***concerns about the prevalence of irregularities in the documentation of ownership [that] may cause uncertainty for investors of securitized mortgages***."

102.   MBS Covered Trusts similar to those at issue here have been unable to foreclose on Mortgages due to irregularities in the chain of title.  Defendants are well aware of this problem as they have served as trustee of certain of these MBS Covered Trusts.  For example, in *Naranjo v. SBMC Mortgage,* No. 11-cv-2229-L(WVG), 2012 WL 3030370 (S.D. Cal. July 24, 2012), the court declined U.S. Bank's motion to dismiss plaintiff's claims that the purported assignment of her Mortgage Loan into a WaMu Covered Trust was not completed by the date required by the trust agreement and, therefore, a subsequent assignment, substitution, and notice of default and election to sell was improper.

103.   Given Bear Stearns and WaMu's well-documented, systemic loan origination and securitization abuses, there is every reason to believe that voluminous exception reports documenting Mortgage file deficiencies were provided to Bear Stearns and WaMu with respect to the Covered Trusts and that these deficiencies similarly went uncured.  Defendants knew or were recklessly unaware in not knowing about these deficient Mortgage files because they received "all Mortgage Files, related documents, statements and all other property" as trustee, as required by the respective PSAs.

## III.   THE INDIVIDUAL DEFENDANTS ARE RESPONSIBLE FOR U.S. BANK'S FAILURE TO DISCHARGE ITS CRITICAL DUTIES

104.   Despite serious warnings concerning the necessity for U.S. Bank to ensure perfect title of the Bear Stearns and WaMu MBS, and despite the high default rates and well known poor performance of the Bear Stearns and WaMu MBS, defendants caused or allowed U.S. Bank to continue to ignore its duties and obligations as trustee for the

Covered Trusts, including failing to even review the transferred Mortgages for potential issues concerning whether the titles were perfect.

**A.    The Individual Defendants Were on Notice of U.S. Bank's Failure to Ensure Proper Transfer of the Mortgage Loans to the Covered Trusts, Yet Refused To Act**

105.    The Individual Defendants, as officers and directors of U.S. Bank, breached their fiduciary duties by causing or allowing the Company to breach its contractual duties under the Governing Agreements, and its obligations under the TIA by failing to ensure that the Mortgage Loans were properly transferred to the Covered Trusts and that those transfers were properly recorded.   The Individual Defendants had considerable knowledge of the defects in the Mortgage Loans, the breaches of Bear Stearns', WaMu's, and their affiliates' representations and warranties, and the harm that this has caused MBS holders. As discussed herein, the Officer Defendants knew, from their review of the Mortgage Loan files, attempts to foreclose on mortgage loans, and from the Covered Trusts' poor performance, or were at least grossly negligent in not knowing that:

- the Mortgage Loans had not been properly transferred to the Covered Trusts;

- the Mortgage Loan files were incomplete;

- many of the Mortgage Loans in the Covered Trusts did not comply with Bear Stearns', WaMu's, and their affiliates' representations and warranties concerning their underwriting quality; and

- MBS holders were being harmed by the defects in the Covered Trusts' Mortgage Loans.

106.    As discussed herein, the Officer and Director Defendants knew of at least the high rate of delinquent and defaulted Mortgage Loans in the Covered Trusts due to the many suits against Bear Stearns, WaMu and their affiliates detailing the high number

of defective loans in their securitizations, and from newspaper articles reporting similar facts.

107.    Despite their knowledge of the above, the Individual Defendants failed to take any action to protect the MBS holders. The Individual Defendants made no effort to cause the Depositors to repurchase, and the Depositors did not repurchase, a single Mortgage Loan because it was of a lower quality than promised by the Depositors' representations and warranties.  Additionally, the Individual Defendants made no effort to cause the Depositors to substitute, and the Depositors did not substitute, a single Mortgage Loan held by the Covered Trusts.

108.    The Officer Defendants further breached their fiduciary duties by causing or allowing U.S. Bank to violate the TIA and breach its contractual duties under the Governing Agreements and by causing or allowing the Company to perform its contractual duties in a negligent manner, including by negligently reviewing the Mortgage Loan files for missing, incomplete, and defective documentation.

109.    The fact that there was a missing link in the chain of endorsements from the originator to U.S. Bank, or that there was no duly executed and recorded assignment of a Mortgage to U.S. Bank, among other things, would have been obvious to a reasonably competent trustee performing its contractual duties with due care.  The Individual Defendants made no attempt to ensure that U.S. Bank exercised due care in its review of the Mortgages.  By failing to ensure that there was a system in place to identify these obvious defects in the documentation of the Mortgage Loan files, or to require that these

defects be corrected, the Individual Defendants breached their fiduciary duties and exposed the Company to hundreds of millions of dollars in liability.

**B.    The Individual Defendants Failed to Cause U.S. Bank to Exercise Its Rights and to Perform Its Duties in a Manner that Benefited and Effectively Protected MBS Holders as Required**

110.    The Individual Defendants also breached their fiduciary duties by causing or allowing U.S. Bank to fail to exercise its powers under the Governing Agreements, and to perform its duties, in a manner that benefited and effectively protected MBS holders.  The Individual Defendants had notice of multiple, serious events that should have caused substantial concern.  The Officer Defendants knew of the many delinquent and defaulted mortgages in the Covered Trusts, indicating that the Depositors had not satisfied their material obligations under the Governing Agreements, and that the Master Servicer had not complied with duties, including failing to require the Depositors to perform their obligations.  The Officer and Director Defendants knew or were recklessly unaware that serious defects had long plagued Bear Stearns and WaMu MBS.  Despite this knowledge, the Individual Defendants failed to ensure that the Company provided the technical notice of default as required to protect MBS holders. Indeed, the Director Defendants made no effort to ensure there was a system in place to ensure the Company satisfied its duties under the Governing Agreements, including any system that would provide notice of the defaults to MBS holders so that they could take steps to protect their own interests.  Through their misconduct, the Individual Defendants denied MBS holders their expected consideration under the Governing Agreements, thus leading to at least two class actions lawsuits against U.S. Bank.

111.   Moreover, by failing to implement a system to determine whether the Covered Trusts have title to the Mortgage Loans, the Director Defendants have caused U.S. Bank to impair and delay its ability to recover losses for those Mortgage Loans where borrowers have ceased making payments, or for those Mortgage Loans that did not comply with the underwriting criteria described in Bear Stearns', WaMu's, and their affiliates' representations and warranties to begin with.

## DAMAGES TO U.S. BANK

112.   As a result of the Individual Defendants' improprieties, U.S. Bank failed to perform its duties and obligations as trustee for the Covered Trusts.  The Individual Defendants' actions have devastated U.S. Bank's credibility and exposed the Company to hundreds of millions of dollars in liabilities.

113.   Further, as a direct and proximate result of the Individual Defendants' actions, U.S. Bank has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)   costs incurred from defending and paying any settlement in the class actions for breach of contract and violations of federal laws; and

(b)   costs incurred from compensation and benefits paid to the defendants who have breached their duties to U.S. Bank.

## DEMAND REFUSED

114.   Plaintiff brings this action derivatively in the right and for the benefit of U.S. Bank to redress injuries suffered, and to be suffered, by U.S. Bank as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as

the aiding and abetting thereof, by the Individual Defendants.  U.S. Bank is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

115.    Plaintiff will adequately and fairly represent the interests of U.S. Bank in enforcing and prosecuting its rights.

116.    Plaintiff was a shareholder of U.S. Bank at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current U.S. Bank shareholder.

117.    Plaintiff made a Demand upon the Board to investigate and remedy the violations of law described herein as required by Delaware law.  As set forth below, the Board has wrongfully refused plaintiff's Demand.  The Board's wrongful decision to refuse plaintiff's Demand was unfounded in law, and was not made independently, on the basis of a good faith and reasonable investigation of the claims made in plaintiff's Demand.  The members of the Board breached their fiduciary duty to inform themselves of all material information reasonably available before determining to refuse plaintiff's Demand, and their decision was not in the best interests of U.S. Bank.  The Board's decision is not entitled to the protection of the business judgment rule.

118.    On February 29, 2012, plaintiff made the Demand on U.S. Bank's Board to "investigate the circumstances surrounding U.S. Bank's violations of the PSA and TIA … through a committee of the Board consisting of independent and disinterested directors with the assistance of outside legal counsel … [which should] be sufficient to determine … which current or former Company employees, officers, and/or directors were

responsible for [the wrongdoing]."   Plaintiff further demanded that following the investigation, the Company must "commence legal proceedings against each party identified as being responsible for the mismanagement and other related misconduct described [in the Demand]," including "claims for breaches of fiduciary duty and indemnification and contribution" and "seek recovery of salaries, bonuses, director remuneration, and other compensation paid to the parties responsible because these parties were unjustly enriched by such compensation."   A true and correct copy of the Demand is attached hereto as Exhibit A.

119.   On April 9, 2012, the Board, through its outside counsel, Peter W. Carter, Esq. of the law firm Dorsey & Whitney LLP, responded to plaintiff.   Despite controlling Delaware law, Mr. Carter stated that the Board would not consider the Demand until plaintiff provided proof that it presently owned shares of U.S. Bank stock and owned the shares throughout the period of the wrongdoing.   Mr. Carter further stated that he believed that plaintiff's accusations of wrongdoing lacked specificity and requested additional, highly specific details concerning plaintiff's allegations.   A true and correct copy of Mr. Carter's April 9, 2012 letter is attached hereto as Exhibit B.

120.   On May 2, 2012, plaintiff's counsel wrote to Mr. Carter and asked the Board to reconsider its position.   Although plaintiff assured Mr. Carter that it was a current U.S. Bank shareholder, plaintiff explained that Mr. Carter's request for proof of stock ownership conflated the well settled legal standards for making a litigation demand with the requirements for a shareholder to have standing to sue derivatively.   Plaintiff further provided substantial, unambiguous authority that explicitly requires a Board to

investigate and evaluate all charges made in a demand, regardless of the shareholders' holding status.   Plaintiff also disagreed with Mr. Carter's assertion that plaintiff's accusations lacked specificity, noting that the accusations were detailed enough to prompt an investigation and that the Board, not plaintiff, had unlimited access to the Company's books, records, employees, and others.  A true and correct copy of plaintiff's May 2, 2012 letter is attached hereto as Exhibit C.

121.    Mr. Carter did not reply to plaintiff's May 2, 2012 letter for over a month. On June 12, 2012, plaintiff sent Mr. Carter another letter urging the Board to conduct an investigation in response to plaintiff's Demand and requested a response by June 22, 2012.  A true and correct copy of plaintiff's June 12, 2012 letter is attached hereto as Exhibit D.

122.    On June 15, 2012, Mr. Carter responded to plaintiff's June 12th letter with a one-paragraph letter, again rejecting plaintiff's Demand.  Citing an inapplicable and non-controlling Pennsylvania Federal District Court Decision, Mr. Carter stated that "We do not agree that the Board is required to commence an investigation in the absence of verification that the demand has in fact been made by a shareholder."  Mr. Carter further stated that "if [plaintiff] reconsider[s its] legal position and provide[s] verification of … ownership of shares we will take appropriate action within ninety (90) days which may include creation of a special litigation committee."   A true and correct copy of Mr. Carter's June 15, 2012 letter is attached hereto as Exhibit E.

123.    On June 20, 2012, plaintiff's counsel responded to Mr. Carter's June 15th letter, again citing controlling Delaware case law explaining that whether a person has

standing to file a derivative action has no bearing on the Board's duty to investigate corporate misconduct brought to its attention in a litigation demand. Plaintiff further noted that the Board's duties to investigate and rectify the harm claimed in a litigation demand do not change, whether or not the demand was sent by a shareholder. Nonetheless, in a good faith effort to reduce further delay, per Mr. Carter's June 15, 2012 request, plaintiff attached a copy of a recent brokerage statement showing its ownership of U.S. Bank stock. A true and correct copy of plaintiff's June 20, 2012 letter and the attached brokerage statement is attached hereto as Exhibit F.

124.   On July 13, 2012, Mr. Carter responded to plaintiff's June 20th letter and stated that he disagreed with plaintiff's interpretation of Delaware law and thus, the Board would not commence an investigation without verification that plaintiff held U.S. Bank shares during the entire relevant period. Mr. Carter's position directly contradicted his statement in his June 15, 2012 letter that the Board would consider plaintiff's Demand if it provided proof of stock ownership. A true and correct copy of Mr. Carter's July 13, 2012 letter is attached hereto as Exhibit G.

125.   On August 6, 2012, plaintiff's counsel wrote to Mr. Carter and asked the Board to reconsider its decision to refuse to commence an investigation unless plaintiff provides proof that it would have standing to sue in the event the Board decided not to pursue the Demand's claims. Plaintiff noted that the Board's refusal to investigate unless it faced a threat of liability is at odds with its members' fiduciary duties of care and good faith, and further noted that plaintiff's standing would only become relevant in the event that the Demand is refused by the Board. Plaintiff also noted that another action was

recently commenced against U.S. Bank concerning forty-one substantially similar trusts that were damaged as a result of similar wrongdoing as described in the Demand, supporting plaintiff's initial concerning of wrongdoing at the Company.  Plaintiff again requested that the Board investigate and then initiate litigation against those that harmed the Company, namely the officers and directors of U.S. Bank and U.S. Bank National Association.  A true correct copy of plaintiff's August 6, 2012 letter is attached hereto as Exhibit H.

126.    The Board never responded to plaintiff's August 6, 2012, letter.

127.    The Board's refusal to respond to plaintiff's August 6th letter confirmed that the Board would not consider the allegations in plaintiff's Demand.  Despite reviewing plaintiff's initial letter almost a year ago, the Board still demands an indefinite reprieve of its duty to consider plaintiff's Demand.  This is not the product of the Board's exercise of its business judgment.

128.    No legal action has been filed by U.S. Bank against any of the Individual Defendants.  Rather than act in the best interest of the Company, the Board instead has focused its efforts on delaying a proper review of the facts detailed in the Demand. Defendants breached their fiduciary duties to U.S. Bank and caused or permitted the Company to perform its contractual duties and obligations owed to the Covered Trusts, as well as duties imposed by the TIA, thus exposing U.S. Bank to millions of dollars in damages and irreparably damaging U.S. Bank's credibility in the market.

129.    The Board's decision to refuse the Demand was not within the ambit of the business judgment rule.  The decision had no basis in law, was not based upon a

reasonable investigation conducted in good faith, and is plainly not in the best interest of U.S. Bank.  Moreover, the Board did not act with due care in making its decision.

130.    Accordingly, plaintiff's institution of this action is necessary to preserve the claims asserted herein for the benefit of the Company.

131.    Plaintiff has not made any demand on the other shareholders of U.S. Bank to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    U.S. Bank is a publicly held company with over 1.8 billion shares outstanding and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

132.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.    The Individual Defendants owed and owe U.S. Bank fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe U.S. Bank the highest obligation of good faith, fair dealing, loyalty, and due care.

134.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within U.S. Bank, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

135.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) the Mortgage Loans had not been properly transferred to the Covered Trusts as required under the Governing Agreements; (ii) the Mortgage Loan files were incomplete; (iii) many of the Mortgage Loans in the Covered Trusts did not comply with Bear Stearn's, WaMu's, and/or their affiliates' representations and warranties concerning their underwriting quality; and (iv) that MBS holders were being harmed by the defects in the Covered Trusts' Mortgage Loans.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

136.    Director Defendants Davis, Stokes, Owens, Levin, Buyniski Gluckman, O'Maley, Collins, Johnson, Schnuck, Kirtley, Baker, Belton, and Reiten as directors of the Company, owed U.S. Bank the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning U.S. Bank's role as trustee for the Covered Trusts.  The Director Defendants knew or were reckless in not knowing that: (i) the Mortgage Loans had not been properly transferred to the Covered Trusts as required under the Governing Agreements; (ii) the Mortgage Loan

files were incomplete; (iii) many of the Mortgage Loans in the Covered Trusts did not comply with EMC's representations and warranties concerning their underwriting quality; and (iv) that MBS holders were being harmed by the defects in the Covered Trusts' Mortgage Loans.   Accordingly, defendants Davis, Stokes, Owens, Levin, Buyniski Gluckman, O'Maley, Collins, Johnson, Schnuck, Kirtley, Baker, Belton, and Reiten, breached their duty of loyalty to the Company and exposed the Company to millions of dollars in liability.

137.   The Audit Committee Defendants, Baker, Belton, Johnson, Kirtley, Owens, Reiten, and Schnuck, breached their fiduciary duty of loyalty by failing to: (i) review relevant information concerning the Company's compliance with applicable legal and regulatory requirements, including the TIA; and (ii) prevent or correct the Company's breaches of its duties under the Governing Agreements and TIA.   The above breaches occurred during their tenure on the Audit Committee, which they knew or were reckless in not knowing.

138.   The Risk Management Committee, Defendants, Baker, Buyniski Gluckman, Collins, Davis, Johnson, Levin, O'Maley, Owens, Reiten, Schnuck, and Stokes, breached their fiduciary duty of loyalty by failing to review and approve meaningful policies relating to regulatory compliance and operational risk matters concerning the Company's duties as trustee for the Covered Trusts.   The above breaches occurred during their tenure on the Risk Management Committee, which they knew or were reckless in not knowing.

139.    The Director Defendants who were sitting on the Board at the time of plaintiff's Demand, Director Defendants Baker, Belton, Buyniski Gluckman, Collins, Davis, Johnson, Kirtley, Levin, O'Maley, Owens, Reiten, Schnuck, and Stokes, breached their fiduciary duty of loyalty by refusing to investigate the allegations in the Demand.

140.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, U.S. Bank has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

141.    Plaintiff, on behalf of U.S. Bank, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

142.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143.    As a result of the Individual Defendants causing or allowing U.S. Bank to fail to perform contractual duties owed to the Covered Trusts, as well as duties imposed by the TIA, the Individual Defendants have caused U.S. Bank to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

144.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

145.    Plaintiff, on behalf of U.S. Bank, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

146.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of U.S. Bank.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to U.S. Bank.

148.   Plaintiff, as a shareholder and representative of U.S. Bank, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

149.   Plaintiff, on behalf of U.S. Bank, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of U.S. Bank, demands judgment as follows:

A.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.   Directing U.S. Bank to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect U.S. Bank and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for

amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.      a provision requiring U.S. Bank to inform and train all relevant employees concerning their duties and obligations as trustee for MBS related transactions, and to ensure that such duties and obligations are actually fulfilled;

2.      a provision requiring the Audit Committee and/or Risk Management Committee to implement a system to ensure the Company complies with all duties and obligations as trustee for MBS related trusts, including by encouraging employees to report to management any perceived failures of the Company to adequately fulfill its duties; and

3.      a provision to permit the shareholders of U.S. Bank to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of U.S. Bank has an effective remedy;

D.      Awarding to U.S. Bank restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: February 5, 2013

ANDERSON, HELGEN, DAVIS
  & NISSEN, PA
AMANDA R. CEFALU

s/Amanda R. Cefalu
_____
          AMANDA R. CEFALU

150 South Fifth Street
Suite 3100
Minneapolis, MN 55402
Telephone: (612) 435-6363
Facsimile: (612) 435-6379
arc@andersonhelgen.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
JULIA M. WILLIAMS
GINA STASSI
600 B Street, Suite 1900
San Diego, CA 92101
Telephone:  (619) 525-3990
Facsimile:  (619) 525-3991
brobbins@robbinsarroyo.com
csmith@robbinsarroyo.com

ROBEIN, URANN, SPENCER,
PICARD & CANGEMI APLC
MARIA CANGEMI
CHRISTINA CARROLL
2540 Severn Avenue, Suite 400
Metairie, LA  70002
Telephone:  (504) 885-9994
Facsimile:  (504) 885-9969

THE WARNER LAW FIRM
PAUL T. WARNER
11123 McCracken Lane, Suite A
Cypress, TX  77429
Telephone:  (281) 664-7777
Facsimile:  (281) 664-7774

692261                                    Attorneys for Plaintiff